AMERICAN METAL CEILING CO., Inc., v. NEW HYDE PARK FIRE DIST. et al.

(Supreme Court, Appellate Division, Second Department.   March 17, 1916.)

1. MUNICIPAL CORPORATIONS ⊙═373(4)—PUBLIC WORKS—MECHANICS' LIENS —PRIORITY.

The lien first perfected against a public improvement should prevail on that account.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. ⊙═373(4).]

2. MUNICIPAL CORPORATIONS ⊙═373(7)—PUBLIC WORKS—MECHANICS' LIENS— TRUST—EVIDENCE.

In a subcontractor's action against a municipal fire district, its contractor, etc., to enforce a mechanic's lien for metal work, evidence *held* to show that the parties contemplated that there should be but one contract and a common fund for payment, notwithstanding an additional resolution and appropriation, and intended to make the fourth payment to the contractor cover the metal ceiling, so that thereafter the additional appropriation was not specifically subject to the lien.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. ⊙═373(7).]

3. MUNICIPAL CORPORATIONS ⊙═373(7)—PUBLIC WORKS—MECHANICS' LIENS— STIPULATION.

In such action, where it was stipulated that the respective notices of lien filed by the plaintiff and by the defendants were valid liens in all respects as to the time and place of filing, the form and substance thereof, etc., such stipulation was a concession that the liens were valid as to the fund in the district's hands, and after the complaint was dismissed as to the contractor, the defendant was not entitled to be relieved from the stipulation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. ⊙═373(7).]

---

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. MUNICIPAL CORPORATIONS ⬤�ota374(1)—PUBLIC WORKS—ENFORCEMENT OF LIENS—RIGHT OF CONTRACTOR'S SURETY.

A surety for a contractor, who, after the abandonment of the contract, completed it in the belief that as surety he was bound to do so, would be regarded as having completed the work to save his bond, and as standing in the same position as his principal, the contractor, and could have no lien on moneys as against a subcontractor to whom his principal was liable.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. ⬤�ota374(1).]

5. MUNICIPAL CORPORATIONS ⬤�ota373(4)—PUBLIC IMPROVEMENTS—MECHANICS' LIENS—APPROPRIATION TO PAYMENT.

In such case the surety's lien for plumbing and heating, third in time, was subordinate to plaintiff's lien, first in time, where the parties had contemplated but one contract and a common fund for payment.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 913; Dec. Dig. ⬤�ota373(4).]

Appeal from Nassau County Court.

Action by the American Metal Ceiling Company against the New Hyde Park Fire District and others. From certain findings of fact and conclusions of law, and from the judgment entered in the County Court (91 Misc. Rep. 236, 154 N. Y. Supp. 661), the Nassau Lumber Company appeals. Modified and affirmed.

Argued before JENKS, P. J., and THOMAS, STAPLETON, MILLS, and PUTNAM, JJ.

Lincoln B. Haskin, of Hempstead, for appellant.

Henry L. Maxson, of Hempstead, for respondent American Metal Ceiling Co.

Neil H. Vandewater, of Mineola, for respondents New Hyde Park fire district and individual fire commissioners.

Alfred H. Dupree, of Sayville, for respondent Heidtmann.

George B. Stoddart, of Mineola, for respondent Christ.

THOMAS, J. It is a question of priority of mechanics' liens. The electors of the New Hyde Park fire district (composed of the two Hempsteads, in Nassau county) voted to raise by taxation a sum not to exceed $5,000, spread over several years, for the purpose of erecting a building for keeping and storing apparatus. That was on December 16, 1913. The fire commissioners, on May 25, 1914. made a contract to do the work for $4,994, which, on the part of the contractor, was signed, "J. E. Heidtmann [L. S.] per J. H. Heidtmann." J. E. Heidtmann (full name John E. Heidtmann), defendant here, residence Sayville, was brother of J. H. Heidtmann, first name Jesse, one of the fire commissioners, residence New Hyde Park. Under the same date a bond was given for the faithful performance of the contract purporting to be executed by "J. E. Heidtmann, George Christ, Mae Heidtmann." John E. Heidtmann's name was forged by Jesse Heidtmann to the contract and signed without authority to the bond. Jesse also forged John's name to the order that all checks should be made to him. The contract did not cover the metal ceiling, heating, or finished plumbing. Later the fire commissioners decided that such omit-

⬤�ota For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ted work should be done, and on June 30th the taxpayers adopted a resolution to levy a tax, also payable through a long period, not to exceed $2,000, "for the purpose of installing necessary plumbing, metal work, and heating in the new fire house now in the course of construction." On July 13, 1914, an addendum was made to the original contract, signed "J. E. Heidtmann, per J. H. Heidtmann." Jesse H. had no authority to execute the supplementary contract in behalf of his brother John. The additional agreement did not specify the work to be done, but there seems to be no doubt but that it was to supply the work covered by the second resolution, and what was omitted in the first contract. In terms it added a payment. Whereas, under the first contract the fourth payment was the final one upon due completion of the building, it was by the supplementary contract made the fifth payment, while the fourth payment was stipulated to be $1,714, "to be paid when the metal ceiling is completed."

The commissioners paid Jesse as follows: First payment, $200, due upon completion of foundation; second payment, $1,300, due when building was sheathed; third payment, $1,500, in July, when the outside was completed and first coat of paint was on; and $1,714, the sum named as the fourth payment under the additional contract, which payment was due when metal ceiling was completed. About August 11th Jesse absconded, and Christ, who was a surety, finished the building. At the completion of the work there was in the hands of the commissioners $1,964. The question is: What lienors should have it? Three are claiming it, to wit, the plaintiff respondent (lien first in time), who put up the metal ceiling; Christ, a respondent (liens third in time), who did the plumbing and finished the building; and the Nassau Lumber Company, appellant (lien second in time), who furnished material that went into the general construction. The judgment gives it to plaintiff, and to Christ on his plumbing contract, and the balance to Christ for finishing the building, as if for that he was an independent contractor. The parties base their several claims to priority upon a number of grounds, which must be taken up seriatim.

[1, 2] The plaintiff's lien is first in time and should prevail on that account; but I must discuss its argument that it and Christ have first liens, because the $2,000 was authorized for metal work, plumbing, and heating, and is held in trust for that purpose, upon the principle used in such cases as Swift v. Mayor, etc., of City of New York, 83 N. Y. 528, People ex rel. Rohr v. Owens, 110 App. Div. 30, 96 N. Y. Supp. 1054, and Davidson v. Village of White Plains, 121 App. Div. 287, 105 N. Y. Supp. 803. How does it appear that the money now on hand is part of the money last ordered to be raised for metal work and plumbing? Respondent's answer in effect is that all the money was to be raised by tax through several years, and meantime the commissioners borrowed it, in the first instance the $5,000 initially authorized, and then the $2,000, later authorized, and all the four payments to the contractor, aggregating $4,714, were made out of the $5,000, and a balance was left. So that, when the last money of the $1,714 was paid to Jesse H. Heidtmann on July 25, 1914, none of the $2,000 had come to the hands of the commissioners. Such seems

to be the fact. Therefore the plaintiff's argument is that none of the $2,000 was in hand when the contractor was paid, and hence it must be the money now in hand. But the fourth payment was to be made only upon the completion of the metal ceiling, and the $250 paid to Jesse on July 16th, and the payment of $1,464 on July 25th, aggregate $1,714, was on the fourth payment of that amount. Hence it must have been on account of the metal ceiling, at least in part.

But I note that the respondent urges that plaintiff's work on the metal ceiling was begun July 16th and finished August 6th; that when the $250 was paid to Jesse the metal work was half done, had not been inspected, and that the architect had not consulted the parties to the contract as to the object of the payment, or inspected the metal ceiling to determine its due completion. But when the payment was made on July 25th the ceiling was substantially completed, as Christ states. Nevertheless the facts show that the payment was to cover at least the metal ceiling, even though the payment was premature. Jesse Heidtmann gave plaintiff two checks, one on August 1, 1914, for $400, and one on August 10th, for $500, but neither was paid. Those checks were intended as "payments for installing the metal ceiling." Such payment necessarily covered the metal ceiling, for the additional contract stipulated that it was due only on such completion. If the $1,714 did not come from the fourth payment, it must have come from the fifth payment, which was due only upon the completion of the building. That is not conceivable.

The intention, then, was to pay whatever a fourth payment was applicable to pay; that is, among other things, the metal ceiling. I will later consider Christ's claim for the plumbing. The ceiling was not done until August 6th. Then the payment was in advance. But the parties could agree to advance it, and did so. No claim is made against the owner on that account, and the fact cannot be used to displace other liens. None of the $2,000 had then been actually received. Therefore the commissioners borrowed from the $5,000 fund to meet payments of work chargeable to the $2,000 fund. If the payment was to cover the ceiling, it is unimportant to the plaintiff where the commissioners got the money to pay the contractor, whether from their own pockets or those of another. The question is: Why and for what was the contractor paid? He was paid for the ceiling, because that item was payable from the fourth payment, and it was the fourth payment that was advanced. Moreover, it is evident that practically the two funds could not be segregated for the purposes of payments. The plumbing and heating and ceiling must progress in harmony with the other work. Pipes must become a part of general construction, and what was due the contractor for plumbing, or general work, could not be well dissociated. If the owner paid the contractor from the first fund for work payable from the second fund, it was a matter between the parties. He could not complain, and, if it was done in good faith, those with whom he contracted should not be permitted to do so. The second agreement was made integral with the first agreement for the purpose of doing a single thing, viz. constructing a building.

The learned judge refers to the statute (Laws 1909, c. 29 [Consol. Laws, c. 24] § 6), that a "funded debt shall not be contracted by a municipal corporation, except for a specific object, expressly stated in the ordinance or resolution proposing it," and indicates that the law impressed upon the $2,000 a trust for the payment of the work for which it was authorized. But the party to receive the fund could agree how he would receive it. In my judgment the addition to the contract appropriated the fund to the fourth payment. The commissioners awarded the main contract for $4,994, which was stated in the resolution to be $1,720 less than the original figures, and it was recited that such sum was an allowance made by J. E. Heidtmann for the following items: Plumbing and heating, $800; metal ceiling, $900; cesspool, $20—total, $1,720. When the contract was made, the metal ceiling, heating, plumbing, and cesspool were omitted, but it was stipulated:

"That should the party of the first part decide to finish the building in one month's time the said party of the second part will do the same for $1,720."

The contract was supplemented to cover the omitted things (save the cesspool), and the last payment of the first contract was made a final one, and a fourth payment of $1,714 substituted, "to be paid when the metal ceiling is completed." The contract for the metal ceiling was $730, and for the plumbing and heating $810, or $1,540, which, with the probable profit to the contractor, would approximate the amount of the fourth payment. The payment actually made was $1,714, which was the fourth payment stipulated. The architect's certificate, dated August 3d (but delivered at a time I do not discover), certifies that the fourth payment is due. The contractor was allowed to draw a few days in advance. His receipt is dated June 27, 1914, which I conceive to be an error in printing. It is impossible from the record to discover accurately the state of the plumbing and heating when the fourth payment was made. Christ was asked as to his contract:

"Q. You hadn't completed it by July 25th, had you? A. Well, no; there were some things to be done yet. Q. Was it substantially completed on July 25th? A. It wasn't all completed until September 22d; then it was odds and ends. Q. But it was substantially completed on July 25, 1914? A. Well, it was about completed."

The testimony continues to some extent, giving scant detailed information. I conclude: (1) That the parties intended to make the fourth payment cover the metal ceiling, plumbing, and heating; (2) that they blended the two contracts in one, and that the main contract conditionally provided for the addendum, and contemplated that there should be one contract and a common fund for payment. So I rest the priority of the plaintiff's lien only upon the fact that it is first in order of filing.

[3] The appellant contends that the plaintiff's lien is void for reasons advanced. It was stipulated:

"That the respective notices of lien filed by the plaintiff and by the defendants Nassau Lumber Company and George E. Christ were in proper and legal form, and were valid liens in all respects in so far as to the time and place

of filing, forms, and substance, and that the filing of all of said liens was in full compliance with the statute."

The stipulation, I think, is a concession that the liens are valid as to the fund in hand. After the complaint was dismissed as to John H. Heidtmann, the appellant asked to be relieved from the stipulation. This was upon the theory that, as it was determined that John H. Heidtmann was not bound by the contract liens filed against him, a new situation had arisen that made the stipulation inequitable. The parties knew when the stipulation was made what the parties claimed, and made it at the hazard of the decision. The plaintiff's lien is filed against Jesse H. Heidtmann as contractor, and the stipulation at least renders it unassailable. So as to the liens of Christ and the appellant.

It remains to consider the relative priority of the lien of appellant and those of Christ. Christ filed three liens on September 30, 1914, one for the plumbing and heating for $830, one for a slag roof $272, and one for $1,069.40 for material and labor to complete the building after Jesse disappeared. The second lien was not allowed, and I do not discuss it. But the lien for plumbing and heating, $830, was preferred to that of the appellant, which was prior in time, and the balance of the money is given on its third lien for finishing the building.

The lien for finishing the building was given priority, because it was considered that Christ was not liable as surety on the bond he gave, because he signed as surety for John, who, by reason of Jesse's forgery, never became obligated as contractor, and that the fire commissioners permitted him to finish the building and accepted it when completed from him. The facts were that Jesse forged his brother's name to the contract, signed his name to the bond without his authority, and forged his name to a letter directing that the checks should be made payable to Jesse. Jesse made the bond in form as surety for John. Christ did not know then that John in form was the contractor, but supposed that his brother-in-law, Jesse, was the contractor, and did not know that John had anything to do with the matter until two weeks after Jesse's departure. He started to finish the building August 11th, the last day he saw Jesse, and completed it September 15th. Therefore he had worked until about August 25th before he knew anything of John's relation to it. He had made a verbal contract with Jesse for the plumbing. He testified:

"Q. After he [Jesse] disappeared, did you start right in, right away? A. Yes; I was working there at the same time and kept the men going."

He testified that Gottsch, a fire commissioner, came over the day Heidtmann went, and——

"asked me if I was going to complete that job, and I told him that I would. * * * When I found that Heidtmann wasn't coming back, that was the third day after the 11th, I told him I was completing the building, and he said: 'All right, we haven't anything to say as long as you complete the building.'"

He further testified that he received instructions from the architect, and a final certificate from him, and also as follows:

"Did you talk with the fire commissioners about being on Heidtmann's bond? A. Yes. Q. With whom? A. Christian Gottsch. Q. What did you tell to him, or he to you? A. I don't know anything that John Heidtmann had anything to do with the building. He was the man that came and told me that John E. Heidtmann was the contractor, and I said, 'Who is that?' and he says, 'He is the contractor just the same,' and he says, 'We have a letter down in the office.' So I went down to see it. I says, 'It is a funny thing that I didn't know anything about John E. Heidtmann being the contractor.' I says. 'If John E. Heidtmann is the contractor; I went bond for Jesse Heidtmann; what have I to do with it?' He says, 'We have the contract all right, and you have something to do with it.' Q. Did he say anything about your being compelled to finish the job? A. Well, in that way, yes. Q. State as near as you can what he said. A. He said I had something to do with it; that is all I remember. Q. Did he say what? A. He thought it was up to me to finish it. Q. Did he say so? A. Well, by the way he talked. Q. He said you had something to do with it? A. Sure."

Christ did not complete the building because he was employed to do so by the fire commissioners, but because he was surety and thought that he was bound as surety to do it, for he testified:

"Q. You went on and completed it as surety? A. I didn't say I did. Q. What did you say? A. I don't know whether I was surety at the time or not; I don't know whether I am surety; I thought I was at that time, but I didn't know it. Q. Didn't you go on and complete it as surety? * * * A. I was working there at the time, and I kept going. I didn't know whether I was surety or not. Q. You thought you were? A. Yes. Q. Didn't you go on and complete it as surety? A. I didn't at the time, I found it out afterwards. Some said I had to complete it, and some said I didn't have to. Q. Who said so? A. Well, different people. Q. John E. Heidtmann didn't ask you to complete it? A. No; I didn't know he had anything to do with it, until two weeks after Jesse went away. Q. Did you ever see this contract before Jesse went away? A. No.

"By the Court: Q. When you had completed it, you knew you had signed this bond? A. Yes; I knew that. Q. And then did you think you were liable under that bond? A. I thought I was; yes. Q. At the time? A. Yes. Q. And that the burden was on you to complete it? A. Yes. Q. To complete it. and that when Jesse went away you were his principal and had to take it up? A. That was my idea; yes. Q. Or the fire district would hold you for it? A. I thought they would; yes. Q. Then you completed it? A. Yes; I thought, if I did not finish it, it would be up to me, and it would cost me so much more.

"By the Court: That was outside of your plumbing contract? A. Yes. Q. What were the circumstances of that? A. I wasn't completed with that at that time. I was working in the building, I didn't know that Heidtmann ran away. I thought he was gone, but I didn't know he was away to stay. I thought perhaps something had happened to him."

[4] The record shows that the fire commissioners stood on their contract. Gottsch, a commissioner, testified:

That Christ said "the work was going along right, and that he was going to pay all bills and see that the work was completed. I didn't answer him."

Christ was Jesse's brother-in-law, and had an interest in saving the latter as far as possible. John knew that his brother had used his name. The work was then some weeks under way; but he made no disavowal of him, and he gave the reason that he wished to save him. Christ was in doubt as to his legal liability, and concluded to act as if he was liable as surety. Under such circumstances he must be regarded as having completed the work to save his bond, and, if so, he

stands in the same position as his principal, and cannot have a lien on moneys as against the subcontractor, to whom his principal was liable. But to support his third lien the court regards Christ as an independent contractor, employed to finish the work, as the fire commissioners themselves could have done. I think that the position is untenable, and that Christ's third lien must yield to appellant's lien.

[5] The last question is whether Christ's lien for plumbing and heating is prior to the appellant's lien, as the court has found. This brings the discussion back to the question whether the $2,000 is to be regarded as yet in the hands of the commissioners and appropriable for the plumbing and heating as against a general materialman. I have already discussed the subject in connection with plaintiff's lien, and will not repeat the argument. To permit the Christ lien to stand prior in payment to that of the appellant, it would be necessary to hold, as I think should not be done: (1) That for the purposes of the contract the two sums, $5,000 and $2,000, must be kept apart, and the payments for each and every item made strictly from each fund accordingly as it falls under the first appropriation or the second, while the contract and the nature of the work shows that it was not so contemplated; (2) that the fourth payment was not intended by the contract to be paid to the contractor to apply on the ceiling, plumbing, and heating contracts, and that it was not paid to the contractor for that purpose. The question whether John E. Heidtmann acquiesced in his brother's misuse of his name bears only on the validity of the liens as to form—a question that is set at rest by the stipulation.

Findings of fact 17, the portion of 33 as regards the words "at the special instance and request of the defendant John E. Heidtmann," and 40, are reversed, and the third conclusion of law is modified by omitting the reference to the addendum, and the fifth, sixth, tenth, eleventh, twelfth, thirteenth, seventeenth, twentieth, and twenty-second are reversed, and appropriate findings and conclusions to establish the lien of the appellant in conformity to this opinion should be made.

The judgment of the County Court of Nassau County, conformed to the findings as amended, should be affirmed, without costs. Settle order before THOMAS, J. All concur.