In the Matter of the Application of N. P. NELSON IRON WORKS, INC., Respondent, for a Peremptory Mandamus Order against CHARLES W. BERRY, Individually and as Comptroller of the City of New York, Appellant.

First Department, February 3, 1933.

*Willard S. Allen* of counsel [*J. Joseph Lilly* with him on the brief; *Arthur J. W. Hilly, Corporation Counsel*], for the appellant.

*Walter C. Goodwin,* for the respondent.

SHERMAN, J. The failure to make the mayor a party requires reversal of the order appealed from. Mandamus may not issue to compel the payment of moneys by the city of New York unless the mayor has been accorded an opportunity to be heard, his concurrence in a payment being required by section 149 of the Greater New York Charter. (*People ex rel. Rangeley Const. Co., Inc.*, v. *Craig*, 197 App. Div. 503, 506; *People ex rel. McClinchie* v. *Prendergast*, 140 id. 235, 237.)

Other grounds advanced by appellant do not, however, suffice to defeat petitioner's application. The contract executed by petitioner with the city of New York for the delivery of certain snow loaders was made pursuant to law, after due advertisement, upon sealed bids, and after petitioner had complied with all prerequisite conditions. This contract is dated October 13, 1931, is in all respects valid and has been fully performed on petitioner's part, so that the city of New York has for a considerable time been in possession of the machines manufactured and delivered to it by petitioner pursuant to that contract. The city has what it purchased and is using the machines but declines to pay for them. These facts stand conceded in the record.

After the machines had stood the tests and while they were in the city's possession, appellant, who now refuses to defray this obligation, inserted a notice in the *City Record* in April, 1932, stating that the warrant for the sum due to petitioner was ready for delivery to petitioner on April 16, 1932. A demand was then made upon him as comptroller for the delivery of the warrant pursuant to that advertisement. A further document, being a written instrument of guaranty, was required on May 16, 1932, which was thereupon executed and delivered by petitioner. It is undisputed that petitioner has fulfilled every term and condition of the contract on its part to be performed. As stated in *Moore* v. *Mayor* (73 N. Y. 238, 248): " When there has been a *bona fide* performance of a contract, of which the city has had the benefit, there is a strong equity in favor of the contractor seeking his pay."

As to the claim that payment ought to be withheld because there is no appropriation out of which to pay this obligation, little need be said. Petitioner pleads in its petition that " the necessary authorization of an appropriation was made " by the Board of Estimate and Apportionment. This is not specifically denied. Appellant proceeded to and did set apart a particular fund to meet these payments out of the moneys appropriated, from which fund he has paid other contractors similarly situated. This is ample proof of recognition of the existence of a fund validly appropriated. Indeed, it is difficult to believe that competitive bids

would have been sought from contractors by public advertisement and allowed to ripen into an executed contract committing the city to make payments — all without any appropriation. It is idle for appellant to contend that there was no appropriation when he has by his conduct admitted its existence in assigning a code number to the fund and in making payments therefrom to others who contracted on the faith of the resolution of the board authorizing their contracts and creating this fund.

The original resolution of the board of estimate and apportionment, dated December 12, 1929, called for the issuance of revenue bonds to defray the cost of contracts for snow removal and payrolls incidental to the removal of snow during the winter season of 1929 and 1930. Evidently this fund was not put to that use, for, in June, 1931, the board of estimate and apportionment, upon the application of the chairman of the sanitary commission for a "reauthorization" of special revenue bonds for snow purposes, adopted an amendatory resolution in which the proposed purchase of the thirty snow loaders was specifically set forth. The earlier resolution was then amended to authorize this, as well as other purchases out of this fund. This procedure appears to have been in accord with established practice and was clearly within the powers of the board of estimate and apportionment. Under that resolution, the city advertised for bidders for the contract, accepted petitioner's bid, has received and retained the machines, is using them and, as appears from the undisputed evidence, must have intended to pay for that equipment, in as much as appellant actually prepared the pay warrant for delivery to petitioner and notified him to call for it by a public announcement inserted in the *City Record*.

Another reason for this non-payment is also urged. The affidavit of the deputy comptroller, verified July 14, 1932, refers to an annexed exhibit which when examined appears to be an unsigned news article clipped from an unnamed publication, which is mentioned as having come to appellant's notice in May, 1932. Upon this anonymous item, which states that large commissions have been paid to an individual upon the sale of the snow loaders, appellant relies to defeat petitioner's right to compensation. It is supported in no respect; no sworn fact is set forth. This newspaper clipping should be treated as no more, really, than mere gossip. Yet appellant claims that it, standing alone, presents an issue which would warrant the denial of this application. Of course, it has no probative value, although it be accompanied by argumentative statements contained in the affidavit of the deputy

comptroller set forth by way of excuse for raising the defense of a lack of a proper appropriation.

If the appellant proposed to show the invalidity of petitioner's claim, section 149 of the Greater New York Charter confers adequate power. It contains the following: " The comptroller may require any person presenting for settlement an account or claim for any cause whatever, against the corporation, to be sworn before him or before either of the deputy comptrollers, touching such account or claim, and when so sworn, to answer orally as to any facts relative to the justness of such account or claim. Wilful false swearing before the comptroller or deputy comptrollers is perjury and punishable as such."

This court is alert to protect the city against fraudulent claims, upon proof being presented. It may not, however, be led to the denial of relief to which a party is *prima facie* entitled when no more is presented than an anonymous news item in lieu of that orderly proof which is required of every litigant. Upon the record before us, marked as it is by an absence of proper averments necessary to create an issue of fact, no defense to petitioner's claim upon the merits was set out. (*People ex rel. Treat* v. *Coler*, 56 App. Div. 459; affd., 166 N. Y. 144.)

The order appealed from should be reversed, with twenty dollars costs and disbursements, and the application for a peremptory order of mandamus denied, with fifty dollars costs.

FINCH, P. J., and MERRELL, J., concur; McAVOY, J., taking no part.

MARTIN, J. (concurring). The petition herein alleges that on or about October 13, 1931, a written contract was entered into by the city of New York and N. P. Nelson Iron Works, Inc., for the purchase of thirty snow loaders, for the sum of $95,550. The petitioner in accordance with the specifications and terms of the contract delivered the thirty snow loaders.

It is further alleged that there appeared in the *City Record* on April 18, 1932, a notice under " Department of Finance " that petitioner's warrant in the sum of $93,250 for payment of the snow loaders would be ready for payment on April 16, 1932; that the petitioner made a demand upon the comptroller's office for the delivery of the warrant as advertised in the *City Record*, and that the comptroller refused to pay the petitioner.

The fact that the comptroller or any other officer is in possession of a warrant to pay money does not make the city liable or require payment. At any time before the money is paid, if it be dis-

covered that the payment would be illegal, the payment may be refused.

In *People ex rel. Mullen Cont. Co., Inc., v. Craig* (114 Misc. 216, at p. 222) the court said: " In view of all these circumstances and the relations existing between the relator and certain material-men referred to in the papers, it does not seem to me as though this were a case where the court ought to exercise the discretion reposed in it to compel the delivery of the warrant which the comp-troller has in his hands. If a writ of mandamus were to issue, it would be tantamount to a decision by the court that the comptroller had no right in this case, or in other similar cases, to conduct the examination of the claimant under section 149 of the charter, for the purpose of inquiring into the question whether contracts which are made after public bidding must be regarded as binding upon the city of New York, even though they were originally obtained by fraudulent or collusive means, as the comptroller states that in his opinion was apparently the case here. I am not pre-pared to subscribe to any such doctrine. Fraud and collusion in obtaining contracts for public work are always a proper subject of inquiry, and I think that the comptroller of the city of New York was not only fully justified by the facts stated in the papers in the present case in desiring to prosecute the fullest possible inquiry into the *bona fides* of this contract, but that he would have been derelict in his duty if he failed to make such inquiry. * * * As I read the charter, it was the intention of the Legislature not to make the comptroller of the city of New York merely an automaton, who must perfunctorily audit and pay all claims against the city which appear on their face to be regular. Rather I think it must be presumed to have been the legislative purpose to throw around the public treasury of the city the highest possible safeguards against fraud or collusion by conferring upon the comptroller, as the responsible head of the finance department of the city, the widest possible powers of investigation into the merits of all claims."

In *People ex rel. McLaughlin* v. *Prendergast* (70 Misc. 6) an application was made for a mandamus to compel payment of a warrant which payment had been refused on the ground that it was discovered, after the warrant was prepared, that the city was not liable. The application for the mandamus was denied. This same case was afterwards before the court and will be found under the title *McLaughlin* v. *City of New York* (158 App. Div. 517; affd., 213 N. Y. 635).

The answering affidavit of the deputy comptroller of the city of New York sets forth the resolution of the board of estimate and apportionment, dated December 12, 1929, by which it is claimed the

appropriation for the contracts in question was made, as follows: "*Resolved*, That the Board of Estimate and Apportionment, pursuant to the provisions of Section 546 of the Greater New York Charter, as amended by Chapter 615 of the Laws of 1917, hereby authorizes the Comptroller to issue special revenue bonds of The City of New York to an amount not exceeding one million dollars ($1,000,000), redeemable from the tax levy of the year succeeding the year of their issue, the proceeds thereof to be used to defray the costs of contracts for snow removal and pay-rolls incidental to the emergency removal of snow and ice from the thoroughfares of the City during the winter of 1929–1930, as certified by the Department of Sanitation and audited by the Department of Finance."

The affidavit further sets forth that on June 12, 1931, the board of estimate and apportionment purported to amend the resolution of December 12, 1929, by a resolution which appears in the minutes of the meeting of the board, as follows: " Department of Sanitation — Amendment of Resolution Authorizing Issue of Special Revenue Bonds for Removal of Snow and Ice During the Winter Season 1930–1931."

The comptroller of the city of New York contends that the appropriation of $1,000,000 made by the resolution of December 12, 1929, was to meet the emergency which existed at that time, namely, during the winter of 1929–1930, and could be applied to that emergency only; that if found unnecessary for that purpose or if the emergency ceased to exist, the appropriation expired by limitation expressed by its own terms and was no longer effective.

The appellant further contends on the authority of *People ex rel. Rangeley Const. Co., Inc.*, v. *Craig* (197 App. Div. 503) that a mandamus will not lie to compel him to pay money, unless the mayor has been made a party defendant to the proceeding and where the petition shows a clear, legal right to either a peremptory or an alternative mandamus order.

An emergency appropriation to remove snow and ice and meet payrolls therefor should not be used to buy machinery and plant. When the appropriation was made to remove snow, it was in the usual form used for many years, and was intended to meet the expenses of actual snow removal, and not to be diverted from that purpose. The facts in this case show just how this money was appropriated and how it was actually used.

In setting forth these facts the comptroller gives several interesting as well as convincing reasons why this mandamus order should not be allowed.

1. The appropriation was made for an emergency, to remove snow and ice, and the resolution adopted by the board of estimate

and apportionment provides that the comptroller is authorized to issue special revenue bonds of the city of New York to an amount not exceeding $1,000,000, " the proceeds thereof to be used to defray the costs of contracts for snow removal and payrolls incidental to the emergency removal of snow and ice from the thoroughfares of the city during the winter of 1929–1930."

2. The letter of William Schroeder, Jr., chairman of the sanitation commission, requested the appropriation of $1,000,000 for the removal of snow and ice from the thoroughfares of the city during the season of 1929–1930. He said: " This authorization is requested at this time for the purpose of providing funds for removal of snow and ice, as the balance on hand would not be sufficient in the event of a snow fall between the present date and January 1st, 1930."

3. The deputy comptroller states that to meet such an emergency promptly, the board of estimate waived compliance with a rule of that board known as rule XIX. On this point the deputy comptroller says that all doubt is removed as to the exact meaning of both the request of the commission and the resolution which was passed as the result of said request by the fact that rule XIX of the board of estimate and apportionment, which requires the laying over for one week of all applications for appropriations for money when such applications first appear on the calendar, was waived in this particular instance in order that the money might be promptly appropriated to meet the then existing emergency.

4. This appropriation was made for the removal of snow and ice in 1929–1930. It was obtained by a special revenue bond issue and, if not used for snow removal in that year, could not be used for any other purpose.

5. The appropriation was made subject to the audit of the department of finance, showing that it was never intended by the commissioner that this money was to be used to buy plant through contracts let after a public letting. Under the charter provisions, when there is a public letting, the power of the comptroller to audit is limited.

6. The deputy comptroller points out that enormous commissions were paid to an agent named McKettrick for obtaining the contracts in question. That may be the real reason for the money being diverted from the purpose for which it was appropriated. No commissions were payable on a contract let at public bidding to the lowest bidder. A contract given after a public letting must be given to the lowest bidder and it is difficult to see, therefore, how an agent was necessary or entitled to a commission for obtaining the contract from the city on the lowest bid.

The above are some of the very cogent grounds why this case should be sent to trial and why the order herein should be reversed. At the trial it may be that the members of the commission may be able to explain the facts set forth in the affidavit of the deputy comptroller, or answer to those responsible to the people of the city. It is at least indicated that there was an ulterior purpose in purchasing the machines in question. In fact we have an affidavit which strongly indicates that fact. If that be true, the court should not prevent a full disclosure of the facts.

It is a well-settled rule of law that where moneys have been appropriated for a specific purpose, by a municipality, they can be used for that purpose only.

In *American Metal Ceiling Co., Inc.,* v. *New Hyde Park Fire District* (91 Misc. 236; affd., 172 App. Div. 763) the court held that moneys raised and appropriated by a municipal corporation for a specific purpose are to be regarded as still in the treasury applicable to the payment of the debt incurred, even if the money has been diverted to other purposes. At page 239 the court said: " It is provided by section 6 of the General Municipal Law (Birdseye, Cumming & Gilbert's Cons. Laws of New York, Laws of 1909), as follows: ' A funded debt shall not be contracted by a municipal corporation, except for a specific object, expressly stated in the ordinance or resolution proposing it.'

" The fire district by this second resolution raised $2,000 for the specific object or purpose of installing the necessary plumbing, metal work and heating in said fire house. A funded debt was thereby created within the meaning of the above section, and to divert the proceeds of the sale of the bonds for any other purpose would be illegal and unauthorized. This fund can be expended only for the specific object specified in the resolution."

In *Swift* v. *Mayor, etc., of City of New York* (83 N. Y. 528) the court, speaking of an appropriation for removing garbage from the streets, said (p. 536): " As before shown, the only remedy of the plaintiff was to follow this fund and the law impressed upon it a trust for the payment of his claim out of it. It was raised for the express purpose of paying obligations incurred in cleaning the streets. It was placed by the finance department in the hands of the police department for that purpose and no other; the duty of so applying it was imposed by law, and the creditors had the legal right to look to that fund for their payment and in fact were confined to the security which it afforded them."

The Attorney-General of the State of New York (Reports of the Attorney-General for the year 1912, page 472) held that section 6 of the General Municipal Law contemplates that each bond issue

shall be devoted to a specific object and that a separation of any part of the proceeds of the sale of said bonds and the application thereof to any other purpose would be illegal and unauthorized.

The contention raised by the comptroller that the proceeds of the special bonds could be used only for a specific purpose, namely, "to defray the *costs of contracts* for snow removal and payrolls incidental to the emergency removal of snow and ice from the thoroughfares of the city during the winter of 1929–1930," appears to be a valid objection, if not a complete answer to the petitioner's application for a mandamus order.

In *Nelson* v. *Mayor, etc., of New York* (131 N. Y. 4) the Court of Appeals held that city officials cannot bind the municipality, either by making or by ratifying a fraudulent contract. (See *Haswell* v. *Mayor, etc., of City of New York*, 81 N. Y. 255; *People ex rel. Smith* v. *Clark*, 174 id. 259.)

In *People ex rel. Beck* v. *Coler* (34 App. Div. 167) Mr. Justice CULLEN, conceding the right of the court to compel the comptroller by mandamus to pay the amount of a contract if the right to payment is clear, stated that the rule would be different if the city repudiated or denied the existence of the obligation.

In *People ex rel. Lentilhon* v. *Coler* (61 App. Div. 223) this court went much further and held that the payment of a debt will be enforced by mandamus only where, upon both the facts and the law, it clearly appears that there cannot be a defense to the claim. The Court of Appeals (168 N. Y. 6) dismissed the appeal in that case, saying that it was clearly within the discretion of the Supreme Court to limit the parties to a common-law action.

In *People ex rel. Guidet* v. *Green* (66 Barb. 630) the court held that a mandamus will not lie to compel the payment of a money demand on contract, where a proper remedy by action exists. In an opinion, Presiding Justice INGRAHAM said: "More especially is such a rule proper where the facts upon which the claim is based are disputed." In a concurring opinion, Mr. Justice BRADY stated: "Neither in England nor in this State has a mandamus been allowed where there was a remedy by action and a reasonable doubt as to the validity of the claim, or any conclusion that it should be examined by due process of law."

In *Matter of Spanhake* v. *Teachers' Retirement Board* (224 App. Div. 75; affd., 249 N. Y. 605) the court held that the denials in the answer of material allegations of fact contained in the petition precluded the granting of a peremptory mandamus order.

In an exhibit attached to the affidavit of the deputy comptroller it is pointed out that the complaint, in an action brought by one Ragner Bielstein to restrain the payment of the commissions

claimed for the sale of the snow loaders to the city, reads in part as follows: " I now believe that these payments given to Daniel H. McKettrick were either graft for procuring the contracts, which payments, I am informed, are illegal, or, in any event, that this money was not therefore paid for commissions as the books of the company now show."

It is intimated that similar transactions have been approved by the comptroller's office and, therefore, this transaction should be approved. It may be that such similar transactions escaped the attention of those in charge of same or there may have been some other reason for such action. Irrespective of the motive, the refusal to pay appears to have been proper.

In the face of the above facts as set forth in the affidavit of the deputy comptroller and the decisions on the subject, I am unable to see how any court could grant a mandamus.

It certainly does not require much argument to show that a peremptory mandamus order should never have been issued in this case, and that the order granting same should be reversed, with twenty dollars costs and disbursements, and the motion denied, with fifty dollars costs.

Order reversed, with twenty dollars costs and disbursements, and application for a peremptory order of mandamus denied, with fifty dollars costs.